*In re* CUSTODY OF ANGELA MARIE PICCIRILLI.—(JACK F. STEPHENS *et al.*, Petitioners-Appellees, *v.* TELPRI PICCIRILLI, Respondent-Appellant.)

First District (3rd Division)    No. 79-1862

Opinion filed September 17, 1980.

Jeffrey Dean Lewis, Ltd., of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisen-

Stein, and Deborah M. Dooling, Assistant State's Attorneys, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Respondent, Telpri Piccirilli, appeals from an order of the circuit court of Cook County granting permanent custody of his daughter, Angela Marie Piccirilli, to petitioners, Jack F. Stephens and Jessie M. Stephens, the maternal grandparents.

Telpri and Sherry Piccirilli, Angela's natural parents, were divorced on December 22, 1971. Custody of Angela, born on January 9, 1970, was awarded to Sherry; Telpri was given reasonable visitation and was ordered to pay $150 per month for Angela's support. From June 18, 1971, until late 1977, Sherry and Angela resided in petitioners' home. In 1977, Sherry and Angela moved to their own apartment. On October 1, 1978, Sherry died. Upon her mother's death, Angela returned to petitioners' home.

On October 6, 1978, respondent filed a petition for modification of the judgment of divorce asking that he be awarded custody of Angela. That same day, the trial court entered an *ex parte* order granting custody of Angela to respondent. On October 10, 1978, the court granted petitioners' motion to vacate its October 6 custody order, awarded petitioners temporary custody of Angela, and allowed respondent liberal rights of visitation. Petitioners then filed a petition for permanent custody. On August 30, 1979, a hearing on that petition commenced at which the evidence adduced was substantially undisputed.

During their stay in petitioners' home, Sherry and Angela occupied separate quarters on the second floor but freely used other portions of the home. The four people ate meals together. At that time, petitioners did not discipline Angela. Late in 1977, Sherry and Angela moved to their own apartment located approximately two miles from petitioners' home. Since Sherry was employed, Angela would be left with petitioners during the day on weekdays. On the weekends, Angela would visit respondent or petitioners.

At the time of the hearing, Angela was in fourth grade at an elementary school located three blocks from petitioners' home. Angela regularly attends Sunday school at the church and has been an active member of the girl scouts for several years. She was described as a cooperative child who presents no disciplinary problems, excels at school, and has numerous friends her age in the neighborhood.

Petitioners are both 61 years old and in good health. They own a two-story home, free of any mortgage, in which Angela has her own bedroom. The home is located in Lansing, Illinois. They regularly attend a nearby church. For his livelihood, the grandfather teaches organ music. The grandmother is not employed outside the home.

The grandfather testified that his annual net income is $8,000, and that, in addition, he receives $150 per month from a retirement trust. They also receive $327 per month from their daughter's social security and $150 per month for child support. They have no outstanding debts.

There are two bank accounts for Angela. The checks for child support are deposited into a savings account which had been opened by Sherry. The money in that account has not been used except to pay for Sherry's burial plot and tombstone. The social security checks are deposited in a checking account from which petitioners pay themselves approximately $300 per month for Angela's expenses, and $5 for each music lesson. The grandfather stated that he has not benefited from the money received for Angela's support. During examination as an adverse witness under section 60 of the Civil Practice Act, the grandfather testified that he earned $4,535 in 1977. In 1978, he earned $10,000, $8,857 of which was derived by cashing in an insurance policy. He attributed his lower earnings in 1978 to his loss of interest in teaching during his daughter's illness.

Petitioners expressed their desire for permanent custody of Angela. They indicated that she is a cooperative and exceptional child, who lived happily in their home. The grandfather also stated that he believed Angela loved respondent, and that respondent must love her. He did not recall telling the social worker that Angela was at an age at which she realized respondent does not love her.

Petitioners offered testimony of various relatives and acquaintances of Angela and themselves, including a pastor and teachers. In substance, this testimony revealed that Angela was content and happy; that she was friendly, well behaved, and excelled scholastically; and that petitioners' home was a proper place for Angela. Quentin Piccirilli, Angela's paternal grandfather, who has not spoken with respondent for eight years, testified that he saw Angela almost every day and observed that she enjoys a good life with petitioners.

Respondent is 34 years old, and his present wife, Cheryl, is 28 years of age. They have two children: Telpri, age 7, and Nicole, age 4. They reside in a two-bedroom home in Calumet City, Illinois, and have a mortgage of approximately $10,000. If respondent were awarded custody, Angela would share a bedroom with Nicole and he and his wife would sleep in the living room. The school in which Angela would be enrolled is three to four blocks away. Girl scout activities are available in the community. The family attends church regularly.

Respondent is employed as a fireman paramedic and as a part-time worker at a fire extinguisher company, and has an annual income of $23,000. Cheryl is a self-employed clothes salesperson who earns approximately $10,000 per year. She can select her hours of employment, and ordinarily works in the evening when respondent is home with the children.

On rebuttal, income tax returns disclosed that Cheryl actually had a net income of $2,167 in 1977, and a loss of $481 in 1978.

Respondent testified that he has a close relationship with his children, and that they are well behaved and disciplined when necessary. Angela plays with children in his neighborhood and interacts well with members of his family. Respondent shows Angela the same love and affection as he shows his other children. Respondent stated that he believed his wife and he are well qualified parents. Cheryl testified that she loves Angela. She considers herself a mother to Angela, and on occasion, Angela has, without instruction, called her "mom." Respondent has made all the child support payments required by the divorce judgment.

Respondent offered testimony of friends, neighbors, co-workers, and church personnel who were familiar with Angela and respondent's family. In essence, they testified that the Piccirillis provided a good home, would be good parents, and enjoyed a close relationship with Angela.

There was some conflict in the evidence concerning the frequency of respondent's visitation and petitioners' cooperation in facilitating such visitation. The record reflects that the parties entered into two agreed orders concerning visitation. The grandmother indicated that respondent visited Angela regularly. The grandfather stated that, after the divorce, respondent visited Angela infrequently, perhaps five or six times a year. He further explained that many telephone conversations with respondent had to be initiated by Angela. He stated that he never denied Angela the right to talk to respondent on the telephone nor objected to respondent's visitation. If granted custody, the grandfather stated that he would not object to or interfere with visitation. Visitation was denied on two occasions, when petitioners had a previous dinner engagement and again when Angela did not want to go to respondent's home. He related that Angela once complained about having to sleep in one bed with her stepmother and Nicole at respondent's home. The grandfather testified that he once refused overnight visitation on the advice of a court counselor, but agreed to it after respondent brought the matter to court. The grandfather described his relationship with respondent as one of mutual respect, not "buddy-buddy." On cross-examination, the grandfather stated that he had not encouraged visitation inasmuch as it was Angela's decision, but that he did not interfere if she wished to visit respondent. He denied telling the counselor that he would not cooperate in effecting an orderly transition from petitioners to respondent. When questioned about an incident in which he informed respondent that Angela was in Michigan although she was actually home, the grandfather explained that at the time he believed his two-week visitation with Angela had not yet ended.

Respondent testified that following the divorce, he had visitation with Angela about once each month. Petitioners' interference caused him trouble in exercising his rights of visitation.

Joyce Scully, a social worker from the Department of Supportive Services, testified. During her investigation, she contacted petitioners and respondent. She also contacted the paternal grandfather, a social worker who had seen Angela, and a babysitter. The homes of both parties were neat, clean, and located in nice neighborhoods. Scully believed, however, that the sleeping arrangements in respondent's home were crowded. The parents shared a bedroom with their four-year-old daughter, who slept in a crib; the son occupied the other bedroom. Although Cheryl did agree to change the arrangement, Scully was concerned about Cheryl's defense of this sleeping situation. Angela was doing well in school, but Scully did not visit the school Angela would attend in respondent's neighborhood. Since neither family was lacking in food or clothing, Scully did not consider the relative finances of the parties to be a determining factor. Based largely on Angela's expressed wishes, what Angela had gone through, and the fact that Angela had lived with petitioners almost her entire life, Scully formed the opinion that Angela should remain with petitioners. Because the age of petitioners concerned her, she recommended that respondent have extended and frequent visitation privileges so as to facilitate a smooth transition should it become necessary. Scully testified that the death of petitioners would hurt Angela regardless of where she was living.

Angela was interviewed by the trial court in chambers. She said that she preferred to live with her grandparents rather than her father. It would hurt her and she would cry if she had to live with her father; and she preferred to stay in the school she was attending. She gets along well with her stepmother and has called her "mom." She enjoys playing with the Piccirilli children. There are children in her grandparents' neighborhood with whom she plays. When in her father's neighborhood, she plays only with the Piccirilli children.

After considering the evidence and arguments of counsel, the trial court found that respondent was a fit person to have custody but that it was in Angela's best interest that she continue to reside with petitioners. Accordingly, the court ordered that the judgment of divorce be modified and amended by granting permanent custody and care of Angela to petitioners; that respondent pay petitioners $150 per month child support; and that respondent be allowed liberal rights of visitation.

■■ Respondent contends that the trial court abused its discretion in awarding custody of Angela to petitioners. The primary consideration in determining custody is the best interest and welfare of the child. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.) The law presumes that it is in the child's best interest to be raised by the natural parent, and ordinarily the natural right of the father will prevail in a contest between him and the grandparents where both parties are equally fit to care for the child. (*Barclay v. Barclay* (1978), 66 Ill. App. 3d 1028, 384 N.E.2d 564; see *In re Marriage of Braden* (1979), 70 Ill. App. 3d 535, 388 N.E.2d 939.) The natural

parent's superior right to custody of a child, however, is not absolute and must yield to the best interest of the child. (*Giacopelli v. Florence Critten- ton Home* (1959), 16 Ill. 2d 556, 158 N.E.2d 613; *Cebrzynski v. Cebrzynski* (1978), 63 Ill. App. 3d 66, 379 N.E.2d 713.) It is not necessary that the natural father be found unfit or be found to have legally forfeited his right to custody if it is in the child's best interests that she be placed in the custody of someone other than the natural parent. *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97, 386 N.E.2d 1153; see *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647.

In custody cases, the trial court is vested with great discretion because it has the superior opportunity to observe the witnesses, evaluate the evidence, and determine the best interests of the child. (*Cebrzynski v. Cebrzynski; Eaton v. Eaton.*) The trial court's determination of custody will not be reversed unless there has been a clear abuse of discretion or the decision was contrary to the manifest weight of the evidence. *Caulkins v. Caulkins* (1979), 68 Ill. App. 3d 284, 385 N.E.2d 1117; *Cebrzynski v. Cebrzynski.*

■■ We find no merit in respondent's contention that the trial court did not consider all the facts, but rather took into account only the facts that Angela lived virtually all of her life with petitioners and desired to remain with them in making its custody determination. In its written order, the court listed numerous additional circumstances which contributed to its deter- mination. These included the following factors: that petitioners have pro- vided a home for Angela, and have given her love and care; that Angela is well behaved and there is no lack of discipline on the part of petitioners; that Angela was integrated into petitioners' home with the consent of her deceased mother prior to her death; that Angela excels at school, attends church, participates in girl scouts activities, has friends located nearby, and is well adjusted in the environment in which she currently resides; and that to remove Angela from her present environment would jeopardize her self-assurance and mental stability. Additionally, the court heard the social worker's recommendation that it was preferable for Angela to remain with petitioners, and the testimony of Angela's paternal grandfather that she enjoys a good life with petitioners. The court was presented with ample evidence to support its decision that it was in Angela's best interest to have custody rest in petitioners.

Respondent argues, however, that the court ignored or overlooked several other relevant factors. He first complains that the court did not consider the disparate incomes of the respective parties. The relative affluence of one party over another will not, without more, justify a transfer of custody. (See *Carroll v. Carroll* (1978), 64 Ill. App. 3d 925, 382 N.E.2d 7.) Respondent suggests that petitioners' finances are a primary concern, inasmuch as the evidence demonstrated that the grandfather is

now without life insurance and has used child support payments to cover the cost of Sherry's funeral expenses. Yet the evidence also revealed that petitioners own their home without a mortgage, have no debts, and the grandfather is self-employed, collects money from a retirement fund, and soon will be eligible for social security payments. No evidence was presented to indicate that Angela was not well provided for in petitioners' home. To the contrary, the social worker's testimony revealed that neither side lacked adequate food or clothing. Based upon the evidence, the court could properly have found that the parties' relative financial status was not a determinative factor.

Respondent also objects to the court's failure to consider that he had satisfied all his child support obligations and visited Angela regularly. While it is uncontroverted that respondent met his child support obligations, the frequency of respondent's visits was disputed. Respondent testified that following the divorce, he visited Angela approximately one day per month, while the grandfather maintained that respondent visited Angela only five or six times a year. Whichever figure the trial court accepted, it could have decided that respondent's contact with Angela was minimal prior to Sherry's death.

Respondent also complains that the court overlooked petitioners' alleged interferences with his visitation privileges as well as the grandfather's hostile attitude. Yet the record reveals that, rather than avoid this area, the court noted the antagonism between the parties and expressly ordered the grandfather to encourage visitation and a strong father-daughter relationship.

Respondent makes the unusual argument that the court erred in not considering the written report of the Department of Supportive Services. The argument is unusual since the report was not admitted into evidence because of respondent's objections. In any event, the social worker who prepared the report testified fully about her observations, findings and recommendation concerning Angela's custody.

■■ In addition, respondent complains of the court's failure to state in its findings that Angela got along well with respondent's family and called Cheryl "mom." These facts, however, are not inconsistent with nor do they negate or lessen the import of Angela's stated preference to remain with petitioners. The court correctly acknowledged that Angela's preference was not controlling, but noted that, in view of her intelligence and sensitivity, her word was entitled to weight. The court did not err in interviewing Angela and considering her wishes as to her custodian. Ill. Rev. Stat. 1979, ch. 40, pars. 602(a)(2), 604.

We do not believe that the trial court abused its discretion in holding it was in Angela's best interest to be in the custody of petitioners. We reject respondent's contention that to affirm the trial court's determination would

be to suggest that whenever a custodial parent lives with the grandparents for a length of time, the grandparents are placed in a better position to obtain custody than the noncustodial parent, even where that parent is better able to care for the child. We in no way endorse such presumption. In determining the child's best interest the court must consider the particular facts and circumstances of each case. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 247 N.E.2d 417.) Length of stay in the home of the party seeking custody is only one circumstance which may be considered.

■■ A review of the record convinces us that the trial court carefully weighed the extensive evidence presented and exercised its discretion with an awareness of the importance of its decision to Angela and the parties seeking her custody. We find no abuse of discretion in the court's determination to award permanent custody to petitioners and to allow liberal and extensive visitation to respondent. Nor can we say that the court's decision was contrary to the manifest weight of the evidence.

We will briefly address respondent's next contention that the trial court erred in its application of section 610 of the Illinois Marriage and Dissolution of Marriage Act. Ill. Rev. Stat. 1979, ch. 40, par. 610.

In colloquy with the court, respondent conceded that the petition being heard was for a modification pursuant to section 610. Respondent urges, however, that he did not agree that it was a petition for a modification of the temporary custody order. In its ruling, the court announced that the petition was one for modification of the temporary custody order of October 10, 1978. Respondent suggests that under this interpretation, once temporary custody has been awarded, the non-custodial parent would bear the burden of proving he is the better parent pursuant to section 610 rather than 602.

Section 602 enumerates relevant factors to be considered in determining custody in accordance with the best interest of the child. Section 610 reflects an underlying policy favoring the finality of child custody judgments and making their modification more difficult. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499.) It provides that the court shall not modify a prior custody judgment unless it finds that a change in circumstances has occurred and that modification is necessary to serve the best interest of the child. (Ill. Rev. Stat. 1979, ch. 40, par. 610(b).) Obviously the death of the parent having custody is a significant change in circumstances such that the custodial portion of the judgment would require modification. *Sholty v. Sholty* (1966), 67 Ill. App. 2d 60, 214 N.E.2d 15.

■■ In its written order, the trial court directed that the judgment of divorce be modified and amended by awarding permanent custody to petitioners. Contrary to respondent's contention, the court, in reaching its decision, did not place upon respondent the burden of proving he would be

the better custodian. Instead, the court observed that the law presumes it is in the child's best interest to be in the custody of the natural father, and then applied the best interest standard embodied in both sections 610(b) and 602. In so doing, the court did not err.

In view of our holding that the court did not abuse its discretion in awarding custody of Angela to petitioners, it is unnecessary to consider petitioners' motion to dismiss the appeal because respondent allegedly failed to file a timely notice of appeal.

For the reasons stated, the order of the circuit court of Cook County is affirmed.

Order affirmed.

McGILLICUDDY, P. J., and RIZZI, J., concur.